GREGORY A. BROWER
United States Attorney
Nevada Bar No. 5232
DANIEL D. HOLLINGSWORTH
Assistant United States Attorney
Nevada State Bar No. 1925
Lloyd D. George United States Courthouse
333 Las Vegas Boulevard South, Suite 5000
Las Vegas, Nevada 89101
Telephone: (702) 388-6336
Facsimile: (702) 388-6787
E-mail: Daniel.Hollingsworth@usdoj.gov
Counsel for the United States of America

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| $999,830.00 IN UNITED STATES CURRENCY, | ) ) ) |
| Defendant. | ) ) |

**COMPLAINT FOR FORFEITURE IN REM**

The United States of America, by and through Gregory A. Brower, United States Attorney for the District of Nevada, and Daniel D. Hollingsworth, Assistant United States Attorney, in a civil cause for forfeiture, respectfully states as follows:

**SUBJECT MATTER JURISDICTION**

1. This Court has jurisdiction under 19 U.S.C. §§ 1603, 1608, and 1610; Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Fed. R. Civ. P. Supp. Rule"); 18 U.S.C. § 981; 18 U.S.C. § 983; 21 U.S.C. § 881; and 28 U.S.C. §§ 1345, 1355, and 1395.

. . .

## IN REM JURISDICTION

2. This Court has in rem jurisdiction over the defendant property because an Order for Summons and Warrant of Arrest in Rem for the Property will be signed by this Court and the Summons and Warrant of Arrest in Rem for the Property will be issued by the Clerk of the Court, which will be executed upon the defendant property and returned to the Court.

## VENUE

3. This Court has venue of this matter pursuant to 28 U.S.C. §§ 1355 and 1395 because the above-named defendant is now and, during the pendency of this action, will be in the jurisdiction of this Court and because the defendant was found in this judicial district.

## PARTICULAR DESCRIPTION

4. The defendant is more particularly described as follows: $999,830.00 IN UNITED STATES CURRENCY.

## PLACE OF SEIZURE

5. On or about August 7, 2008, $999,830.00 in United States Currency ("defendant") was seized on land near Mile Marker Clark 53, Interstate 15 southbound, Las Vegas, Nevada, by duly authorized officers of Nevada Highway Patrol ("NHP"), Las Vegas Metropolitan Police Department ("LVMPD"), and the United States Department of Justice, Drug Enforcement Administration ("DEA"), Las Vegas, Nevada.

## CUSTODY OF ASSET

6. The defendant has remained in the care, custody, and control of the United States Marshals Service, Las Vegas, Nevada, since August 29, 2008.

## TIMELY FILING

7. The defendant was subject to administrative summary forfeiture proceedings; however, Michael Simard ("Simard") filed a claim on or about October 15, 2008.

## VALUE

8. The defendant's value is US $999,830.00.

**FACTS**

9. On August 7, 2008, at approximately 10:44 p. m., NHP Sergeant Eric Kemmer ("Sergeant Kemmer") was on patrol monitoring the flow of traffic, when he observed a white Ford, bearing Ohio registration DCH9453 ("Ford"), exceeding the posted speed limit, and obtained a rear pace of 79 miles per hour in a posted 75 miles per hour zone on Interstate 15 southbound near Mile Marker Clark 53.

10. On August 7, 2008, at approximately 10:44 p. m., Sergeant Kemmer initiated a traffic stop on the Ford near Mile Marker Clark 53 and contacted the driver, who identified himself with a British Columbia, Canada, driver's license as Michael Andrew Simard ("Simard"). Sergeant Kemmer advised Simard that the reason for the stop was Simard's speeding 79 miles per hour in a 75 miles per hour zone.

11. Sergeant Kemmer asked to see the registration to the vehicle. Simard gave Sergeant Kemmer a Hertz rental agreement for a one-way rental from St. Louis, Missouri, to Las Vegas, Nevada in the amount of $705.

12. Sergeant Kemmer observed the following items in the interior of the vehicle: a black backpack on the right front floorboard; an atlas on the right front passenger seat; two GPS devices, one located right of the center console and the other located to the left of the steering wheel on the windshield; and two cellular phones in the area of the center console and right front passenger seat.

13. The following facts support that Simard was a smuggler: (1) Simard's use of a rental car is a common method used by illegal contraband, drugs, and/or money smugglers to distance themselves from guilt and offer a defense if illegal contraband, drugs, and/or money is discovered by law enforcement; (2) the vehicle was cluttered with several snacks as if someone was traveling with minimal stops, which is a common method for smugglers because the smugglers do not want to leave a vehicle with contraband, drugs, and/or money unattended while in transit; (3) the black backpack on the right front floor board would hold insufficient clothing for the road trip; (4) the atlas on the front right passenger seat; (5) two GPS tracking devices inside the rental vehicle is a common method

used by illegal contraband, drugs, and/or money smugglers to keep track of the contraband, drugs, and/or money while in transit; and (6) two cellular phones in the area of the center console and right front passenger seat is a common method used by illegal contraband, drugs, and/or money smugglers to keep in contact with the driver while in transit.

14. Sergeant Kemmer asked Simard the circumstances surrounding his trip. Simard told Sergeant Kemmer he was traveling from St. Louis, Missouri, to Las Vegas, Nevada. Simard told Sergeant Kemmer he was going to meet friends in Las Vegas, Nevada and play craps, but Simard did not know where he would be staying in Las Vegas, Nevada.

15. Sergeant Kemmer conducted a records check on Simard, who had a hold on his license, but it was still valid. Sergeant Kemmer asked Simard if he knew a hold was on his license. Simard stated he had no idea he had a problem.

16. On August 5, 2008, Simard flew on Air Canada from Montreal, Canada to Newark, New Jersey. Simard later traveled to St. Louis, Missouri. Sergeant Kemmer felt it unusual that Simard would drive from St. Louis, Missouri to Las Vegas, Nevada (1) after already flying, (2) paying the rental car fee of $705, and (3) paying approximately $5.00 per gallon of gas when a flight to Las Vegas, Nevada would cost less. Sergeant Kemmer asked Simard why he was driving all the way from St. Louis, Missouri to Las Vegas, Nevada. Simard stated he had never driven cross country. Without being asked, Simard suddenly informed Sergeant Kemmer he was going to the Bellagio to meet two people and gave Sergeant Kemmer their names, which were very generic names. Simard's level of nervousness was rising.

17. Sergeant Kemmer became concerned for his own safety because of the circumstances surrounding the traffic stop of Simard and because the Ford that Sergeant Kemmer pulled over may have been with an escort decoy vehicle which could come upon Sergeant Kemmer and ambush him because it is not uncommon for illegal contraband, drugs, and/or money smugglers to have an escort decoy vehicle to guard the smuggling vehicle. Based on the totality of the circumstances and Sergeant Kemmer's training and experience, Simard was a smuggler of drugs or illegal drug proceeds, and as

1  a result, Sergeant Kemmer feared for his life. Sergeant Kemmer called NHP Trooper Eddie
2  Dutchover ("Trooper Dutchover") for assistance.

3        18. On August 7, 2008, at approximately 10:53 p.m., NHP Trooper Helms and Trooper
4  Dutchover arrived on the scene to assist Sergeant Kemmer. Sergeant Kemmer summarized the facts
5  of the stop to Trooper Dutchover. Simard sat in his driver seat and avoided establishing eye contact
6  with Sergeant Kemmer. At Sergeant Kemmer's request, Simard exited the Ford and went to the front
7  of Sergeant Kemmer's patrol unit. Subsequently, Sergeant Kemmer returned Simard's driver license
8  and all other documents Simard had presented to Sergeant Kemmer at the time of the traffic stop.
9  Sergeant Kemmer issued a verbal warning to Simard for speeding and possible driver's license
10 violation. Sergeant Kemmer told Simard he was free to leave and thanked Simard for his time.

11       19. After Simard took four steps back to his vehicle, Sergeant Kemmer asked Simard if he
12 could ask him a few questions, to which Simard answered, "Yes." Simard turned and walked back
13 towards Sergeant Kemmer. Sergeant Kemmer asked Simard if he had anything illegal in his vehicle.
14 Simard stated, "No." Sergeant Kemmer asked Simard if law enforcement could search Simard's
15 rental vehicle. Sergeant Kemmer presented Simard with a consent to search form and asked him to
16 read the consent to search form and make sure he understood the consent to search form. Simard read
17 the consent to search form, began to act very nervous, and refused to make eye contact with Sergeant
18 Kemmer. Simard asked if it was normal for law enforcement to ask to search a vehicle. Trooper
19 Dutchover explained that with the current threat assessment and homeland security issues, the
20 Troopers wanted to make sure Simard was not transporting anything illegal. Trooper Dutchover
21 stated he was sure that Simard could appreciate the Troopers doing their jobs, to which Simard
22 nodded his head in an affirmative motion, indicating he understood. Simard kept reviewing the
23 consent to search form and began stuttering when he spoke. Simard signed the consent to search form
24 on August 7, 2008, at approximately 11:00 p.m. When Simard signed the consent to search form he
25 became extremely nervous. After signing the consent to search form, he placed the pen on the
26 clipboard in slow motion, handed the consent to search form to Sergeant Kemmer, dropped his arms

5

to his side, and exhaled with a blank look on his face. Trooper Dutchover noticed a change in Simard's facial expression. Simard had a serious look on his face. Based on Sergeant Kemmer's and Trooper Dutchover's training and experience and Simard's body language and demeanor, Sergeant Kemmer and Trooper Dutchover knew Simard was engaged in transporting illegal drug proceeds.

20. Trooper Dutchover asked Simard to stand on the right dirt shoulder of the road, and Simard agreed to do so by saying, "Sure." Simard moved to the right dirt shoulder of the road where he was close enough to the Troopers so that the Troopers could hear Simard if he revoked his consent.

21. Sergeant Kemmer told Trooper Dutchover to obtain the keys from the ignition and open the trunk. Simard appeared overly concerned about the trunk. Trooper Dutchover obtained the keys from the ignition of the Ford, opened the trunk, and observed a blue canvass-type suitcase to the right and a blue duffle bag to the left inside the trunk. Sergeant Kemmer stood at the right rear of the Ford watching Simard and looking into the trunk. Simard appeared overly concerned as to what the Troopers were doing in the trunk. Trooper Dutchover lifted up the blue canvass-type suitcase, which was extremely heavy, and placed it back in the trunk. Trooper Dutchover knew clothes were not in the blue canvass-type suitcase because of its solidness. Trooper Dutchover felt the outer portion of the blue canvass-type suitcase and felt the contents of the blue canvass-type suitcase appeared to be bundles of United States Currency. Based on Trooper Dutchover's experience and training, the portion size and shape appeared to be consistent with United States Currency. Trooper Dutchover told Sergeant Kemmer that Simard was loaded with cash, knowing that narcotic smugglers usually travel northbound on I-15 and United States Currency smugglers usually travel southbound on I-15. Trooper Dutchover gained access to the blue canvass-type suitcase and observed numerous bundles of United States Currency. Sergeant Kemmer removed the locked blue duffle bag from the trunk, opened it, and observed multiple bundles of United States Currency.

22. On August 7, 2008, starting at approximately 11:05 p.m., Sergeant Kemmer notified NHP dispatch that a large amount of United States Currency was found, called the Interdiction Team Sergeant and asked him to come, requested a trained and certified narcotic detection dog, and called

his Lieutenant concerning the money. Trooper Dutchover told Simard several times that Simard was not under arrest and that Simard was free to leave at any time. Trooper Dutchover told Simard the Troopers found money inside two bags in the trunk. Trooper Dutchover asked Simard to come over to the back of the rental car and to look at the blue canvass-type suitcase, the blue duffle bag, and the money. When Simard went to the back of the rental car and looked at the blue canvass-type suitcase, the blue duffle bag, and the money, Trooper Dutchover asked Simard if he knew anything about the blue canvass-type suitcase, the blue duffle bag, and the money. Simard stated, "No." Trooper Dutchover asked Simard if he would voluntarily go to the NHP garage so that the Troopers could conduct a further investigation. Simard stated he did not want to go to the NHP garage and wanted the Troopers to handle this matter on the side of the road. Simard stated he would cooperate with the Troopers and had no problem waiting until the Troopers finished their business. Trooper Dutchover asked Simard if the money belonged to him. Simard had a worried look on his face and said that no, those bags and money were not his. Trooper Dutchover explained the disclaimer form to Simard, who said he understood the disclaimer form. On August 7, 2008, at approximately 11:17 p.m., Simard wrote out a voluntary statement in his own words. Simard wrote, "Bags aren't mine. Money isn't mine." Simard specifically did not claim possession of the United States Currency and also did not claim he held the United States Currency for any other person who was the owner of the United States Currency. Instead, Simard signed the disclaimer form saying he disclaimed any right, title, or interest to the United States Currency.

23.     On August 7, 2008, at approximately 11:30 p.m., Las Vegas Metropolitan Police Department K-9 Unit ("LVMPD") was requested to respond to the location. At approximately 11:40 p.m., LVMPD Detective Dale Jaeger arrived and retrieved the trained and certified narcotic detection dog, Jack, from his vehicle. Jack began a sniff of the exterior of the vehicle starting at the rear driver's side and worked in a counter clockwise direction. Detective Jaeger then placed Jack inside the vehicle. Jack sniffed the interior of the vehicle including the trunk and the bag located on the front passenger floor. Jack did not show any change in behavior inside or outside the vehicle.

24. Jack conducted a sniff of three pieces of luggage that were on the ground behind the vehicle. Jack demonstrated a change of behavior and alerted to the presence of the odor of an unknown controlled substance on the blue canvass-type suitcase and blue duffle bag. The third piece of luggage was a backpack, and Jack did not give a positive alert for the odor of narcotics. Detective Jaeger opened all three bags and found the blue canvass-type suitcase and blue duffle bag contained United States Currency. The third bag contained personal items.

25. Trooper Dutchover asked Simard if he could look at the phone numbers in his phone. Simard replied, "Sure, go ahead, you can look at my phones." Trooper Dutchover observed that Simard's BlackBerry was locked. Trooper Dutchover asked Simard if he would unlock his phone. After two unsuccessful attempts at unlocking the phone, Trooper Dutchover asked Simard if he knew the password to unlock his phone. Simard stated he forgot it. Sergeant Zeal, another LVMPD officer on the scene, said the password was blackberry and typed in blackberry. Upon doing so, all of the information in the phone was wiped clean.

26. Trooper Helm photographed the vehicle, the blue canvass-type suitcase, and the blue duffle bag. DEA Special Agent Jeff Bell arrived and informed Simard that DEA was going to seize the United States Currency. Simard departed the scene.

27. The United States Currency was seized and transported to the LVMPD evidence vault where a money count was conducted. The United States Currency had the following denominations: two (2) $5.00 bills, one hundred (100) $10.00 bills, and 49,941 $20.00 bills. The United States Currency totaled $999,830. The United States Currency in the blue canvass-type suitcase and blue duffle bag was wrapped with rubber bands in various denominations and was derived from the sale of and/or was used to purchase narcotics.

28. On August 12, 2008, Simard flew from Seattle, Washington to British Columbia, Canada.

## FIRST CAUSE OF ACTION

29. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 28 as though fully set forth herein.

8

30. The defendant was furnished or was intended to be furnished in exchange for controlled substances in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

### SECOND CAUSE OF ACTION

31. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 28 as though fully set forth herein.

32. The defendant is proceeds traceable to exchanges of controlled substances in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

### THIRD CAUSE OF ACTION

33. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 28 as though fully set forth herein.

34. The defendant was used or was intended to be used to facilitate violations of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

### FOURTH CAUSE OF ACTION

35. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 28 as though fully set forth herein.

36. The defendant was involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, or is property traceable to such property, and is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

### CONCLUSION

37. Because of the foregoing, the defendant is subject to seizure and to forfeiture and has become and is forfeited to the United States of America, plaintiff, under 18 U.S.C. § 981(a)(1)(A) and 21 U.S.C. § 881(a)(6).

. . .

WHEREFORE, the United States of America, Plaintiff, prays as follows:

1. Due process issue to enforce the forfeiture of the defendant;

2. Due notice be given to any interested party to appear and to show cause why the forfeiture should not be decreed;

3. The defendant be condemned and be forfeited to the United States; and

4. This Court enter other and further relief as it deems just and proper.

DATED this 13th day of January, 2009.

    Respectfully submitted,

    GREGORY A. BROWER
    United States Attorney

    /s/DanielDHollingsworth
    DANIEL D. HOLLINGSWORTH
    Assistant United States Attorney

## VERIFICATION

I, Jeffrey Bell, Special Agent, Drug Enforcement Administration, am the Agent assigned to this case.

I have read the contents of the foregoing Complaint for Forfeiture In Rem and I declare and verify under penalty of perjury that the foregoing is true and correct.

DATED: 1-12-09

*Jeffrey Bell*, Special Agent
Drug Enforcement Administration

## VERIFICATION

I, Eddie Dutchover, Nevada Highway Patrol Trooper, am the patrolman assigned to this case.

I have read the contents of the foregoing Complaint for Forfeiture In Rem and I declare and verify under penalty of perjury that the foregoing is true and correct.

DATED: 01-12-09

Eddie Dutchover, Trooper
Nevada Highway Patrol

## VERIFICATION

I, Eric Kemmer, Nevada Highway Patrol Sergeant, am the patrolman assigned to this case.

I have read the contents of the foregoing Complaint for Forfeiture In Rem and I declare and verify under penalty of perjury that the foregoing is true and correct.

DATED: 01/12/09

Eric Kemmer, Sergeant
Nevada Highway Patrol